

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PHILIP C. BODENSTAB, M.D., )
    Plaintiff )
)    No. 05 C 281
v. )
)    The Honorable William J. Hibbler
COUNTY OF COOK, LACY L. THOMAS, )
AND BRADLEY LANGER, M.D., )
    Defendants. )

## MEMORANDUM OPINION AND ORDER

Dr. Philip Bodenstab called a friend and told her that "[maybe] I'll take some people with me if I have cancer . . . [m]aybe it wouldn't be so bad being dead if you've got metastases . . .[t]hey shoot horses don't they." Whether made in jest or in a moment of frustration, Bodenstab's comment sufficiently alarmed his friend such that she called both the Chicago Police and the FBI, setting in motion a series of events that eventually led to the Cook County Hospital's decision to terminate him. After his termination, Bodenstab sued the Hospital, raising a host of claims related to the Americans with Disabilities Act and associated due process claims concerning his discharge. Both parties move for summary judgment.

### I. Factual Background

In 2002, Bodenstab worked as an anesthesiologist at Cook County Hospital in Chicago, Illinois. (Def. 56.1(a)(3) St. ¶ 1). In February 2002, Bodenstab called a friend, Jennifer Wengeler in Seattle, Washington, and discussed with her an upcoming appointment he had at the Mayo Clinic in Rochester, Minnesota. (Wengeler Dep. at 9-10). According to Wengeler, Bodenstab told her that if he learned

1

from his appointment at the Mayo Clinic that a lesion on his lip had metastasized, he would kill his former supervisor, Dr. Alon Winnie and several other co-workers. (Wengeler Dep. at 9-10).[1]

Alarmed, Wengeler contacted the Chicago Police Department and the Seattle Field Office for the FBI. (Def. Ex. 4; Wengeler Dep. 14-16). The Chicago Police Department, the FBI, and the Cook County Hospital Police all conducted investigations based on Wengeler's report. (Def. Exs. 4-6). Shortly thereafter, Dr. Bradley Langer, the Hospital's Medical Director, spoke with both the Chicago Police Department and the FBI about the threats made by Bodenstab. (Langer Dep. 16-20). The Chicago Police told Langer that it believed the threat posed by Bodenstab to be credible. (Langer Dep. at 41, 110). Langer did not immediately suspend Bodenstab, but informed him of the ongoing investigations. (Pl. 56.1(b)(3)(C) St. ¶¶ 6-7).

In March 2002, FBI Agent Mark Quinn and Cook County Hospital Police Sergeant Curlee Adams met Bodenstab, who denied making any threats regarding Hospital personnel. (Def. St. ¶ 4).

---

[1] In desperate attempts to minimize the damaging statements Bodenstab made to Wengeler, he points to other portions of her deposition, notably a portion of her deposition where she says that he also discussed marrying a 20-year-old "bimbo" in order to ensure that Cook County would pay retirement benefits long after he might die. *See* Wengeler Dep. at 48-58. These passages of Wengeler's deposition do nothing to contradict her earlier statements. Bodenstab also points the Court to numerous exhibits that he believes to contradict Wengeler's deposition testimony. Bodenstab's reliance on these exhibits is misplaced. For example, he points to an affidavit that his counsel prepared for Wengeler to sign. Not only did Wengeler refuse to sign the affidavit, but instead made numerous additional written comments that suggest she did in fact consider Bodenstab's threats to be serious. *See* Pl. Ex. 161.

Bodenstab also suggests that Wengeler's deposition is hearsay. The Defendants offer it, however, not to demonstrate that Bodenstab actually made the death threats, but to demonstrate the effect of the words upon Ms. Wengeler — namely that she promptly called both the police and the FBI. Moreover, Bodenstab himself admits making the statements that Wengeler testified he had made. (Bodenstab Dep. 90-92, 115-116).

Finally, Bodenstab suggests that Wengeler's deposition is "after-acquired" evidence and cannot be used by Defendants in their summary judgment motion. But Defendants do not use Wengeler's deposition testimony as evidence of their reasons for terminating Bodenstab; they instead use it to chronicle the series of events that led to his termination.

Despite Bodenstab's denial of wrongdoing, Langer suspended him with pay and directed him to submit to psychiatric evaluation with Dr. Karl Wahlstrom. (Def. Ex. 14). Bodenstab, however, disregarded Langer's order and initially refused to see Wahlstrom. (Bodenstab Dep. at 123). The Hospital insisted that Bodenstab undergo a psychiatric evaluation, but Bodenstab repeatedly resisted the Hospital's requests. (Def. St., Ex. 15). Eventually, the Hospital informed Bodenstab through his counsel that it had accommodated his requests for the selection, scheduling, and confidentiality of his evaluation and that if he did not report to the Professional Review Center in Lawrence, Kansas, on August 19 it would initiate termination proceedings against him. (Def. St., Ex. 15). Bodenstab finally relented and attended a five-day evaluation at the PRC. (Def. St., ¶¶ 24-25).

At the PRC, Dr. Scott Stacy, among others, evaluated Bodenstab and authored a Multidisciplinary Assessment. (Def. St., Ex. 8). During the evaluation process, Bodenstab admitted to Stacy at the very least to the content of his conversation with Wengeler. Bodenstab explained to Stacy that he was attempting to "push her buttons" because he was angry with her for refusing to help care for him after he had cared for her during her recovery from cancer. (Def. St., Ex. 8 at 3; Stacy Dep. at 58-59).

After the evaluation process, Stacy concluded that Bodenstab suffered from a Mood Disorder and a Psychotic Disorder and that at the time he was impaired and unable to practice medicine with skill and safety. (Def. St., Ex. 8 at 4-5). Stacy also concluded that the probability that Bodenstab was an active danger to himself or others was low. (Def. St., Ex. 8 at 5). Nevertheless, Stacy concluded that "without proper medication and intensive, supportive therapeutic intervention" Bodenstab would not be able to recover from his psychiatric symptoms, and recommended he enter an intensive day or residential treatment program. (Def. St., Ex. 8 at 5).

After receiving the PRC's multidisciplinary assessment, the Hospital informed Bodenstab that based on the PRC's multidisciplinary assessment it was lifting his paid suspension, but not immediately returning him to work. (Pl. St., Ex. 109). The Hospital then informed Bodenstab that he may not return to work without prior approval from Lacy Thomas, the Hospital Director. (Pl. St. ¶ 12). Choosing to use vacation and sick leave, Bodenstab voluntarily entered the PRC's intensive day treatment program, where he spent three months. (Def. St., Ex. 19, Pl. St. ¶ 11).

Over the course of the treatment program, Bodenstab engaged in psychotherapy with PRC personnel, underwent psychological testing, and participated in group therapy. (Def. St., Ex. 19). During Bodenstab's treatment, the PRC treatment team observed that he had "a tendency to shift into a highly defensive, idiosyncratic, and intimidating mode of interpersonal relatedness" whenever he perceived others to be mistreating him. (Def. St., Ex. 19 at 2). Throughout treatment, Bodenstab continued his effort to convince PRC staff of his explanation of his conversation with Wengeler. At one point, Bodenstab wrote Stacy a memo explaining his conversation with Wengeler. (Pl. St. ¶ 9). Bodenstab explained he used conditional syllogisms to push Wengeler's buttons and vent his anger towards her because she had not offered to come to Chicago to care for him. (Pl. St., Ex 153). In the memo, Bodenstab goes out of his way to lash out at Wengeler, disparaging her character in an apparent effort to make her seem uncredible. (Pl. St., Ex. 153).[2]

At the conclusion of his treatment program, Bodenstab requested an independent evaluation of his psychological functioning. (Def. St., Ex. 19 at 4). Dr. Kostas Katsavdakis administered a battery of psychological tests and reported that he suspected Bodenstab had searched the internet so that he

---

[2] For example, in a section where Bodenstab describes Wengeler's characteristics, he states that she "has a flawed mental perception" and that she advocates non-violence "perhaps as a result of [her] recognition that she used physical violence to discipline her biracial bastard son during his development." (Pl. St., Ex. 153).

4

could provide "normal" answers to Rorschach protocol; a suspicion which the PRC included in its report. (Def. St., Ex. 19 at 4).

After Bodenstab completed the treatment program and independent evaluation, Stacy authored a discharge summary sharing the PRC staff's conclusions. Among other things, the treatment team concluded that Bodenstab's ability to remain clear minded would become compromised by strong feelings when issues related to the Hospital emerged and that "his thinking would become highly personalized, over-elaborative, and rigid." (Def. St., Ex. 19 at 3). The team believed that "his vulnerability to be disruptive under certain highly charged political contexts could possibly lead to compromised patient care" and that he remained "a bit unsteady when faced with issues associated with Cook County Hospital." (Def. St., Ex. 19 at 3). The team concluded, however, that "in the absence of having dealings with Cook County Hospital, [it] did not have significant concerns about his ability to practice medicine with skill and safety." (Def. St., Ex. 19 at 3).

Upon his discharge, Bodenstab desired to return to the Hospital. In November 2002, Dr. Patricia Bush, an employee health service physician at the Hospital, signed a disposition form referring Bodenstab to the medical director but indicating "return to work with restriction" (Pl. St., Ex. 60/3). Bush testified that she listed no restrictions to protect Bodenstab's privacy and allow his personal psychiatrist to assess any necessary restrictions. (Bush Dep. at 48-51). A few days later, Bodenstab met with Dr. Deerpak Kapoor, a psychiatrist at the Hospital. (Def. St. 37). Kapoor ended the interview abruptly because he felt Bodenstab's paranoia was escalating and because he feared for his safety. (Kapoor Dep. at 152-53). Kapoor concurred with the PRC's conclusion that Bodenstab was not capable of handling an emotionally-charged environment. (Kapoor Dep. at 111-116). After the meeting, Kapoor spoke with Bush and Langer and informed them that he believed Bodenstab was still paranoid and angry

5

and would not "be able to handle an emotionally-charged situation, which he was going to get if he goes back to work." (Kapoor Dep. at 118-119).

Despite the less-than-favorable meeting with Kapoor, Bodenstab wrote to Langer requesting that the Hospital allow him to return to work. (Pl. St. ¶ 21). Later in December, Bodenstab wrote to Thomas, again attempting an explanation of his conversation with Wengeler. (Pl. St. Ex 57; Def. St. Ex 13). In the letter Bodenstab insists that he has operated at all times with a rational mind and avers that nothing limits his ability to perform his job. (Pl. St., Ex. 57; Def. St. Ex. 13).

Despite Bodenstab's letter, Langer responded in writing, informing Bodenstab that the Hospital had scheduled a pre-disciplinary hearing in February at which the Hospital would charge Bodenstab with threatening to kill his former Department Chairperson and several co-workers. (Def. St., Ex. 12). Langer discussed the FBI and Chicago Police investigations as well as Bodenstab's treatment at the PRC. (Def. St., Ex. 12). Finally, Langer informed Bodenstab that the reports of the PRC and Kapoor led the Hospital to believe that he posed a direct threat to the health and safety of other individuals in the workplace, and therefore refused to allow Bodenstab to return to work prior to the hearing. (Def. St., Ex. 12).

The Hospital gave Bodenstab a pre-disciplinary hearing, at which he was represented by counsel. (Def. St. ¶ 45). After the hearing, the State's Attorney's Office wrote Cook County Board President John Stroger and informed him that Thomas and Steve Klem, a consultant for Cook County's Bureau of Health Services, recommended that the Hospital terminate Bodenstab. (Def. St., Ex. 27). In October 2003, the Hospital terminated Bodenstab. (Def. St., Ex. 18 at 2).

Bodenstab filed a grievance regarding his termination. (Def. St., Ex. 18). At one point during a subsequent grievance hearing, Bodenstab explained that when the Hospital sent him to the PRC, he

"wouldn't cooperate with him . . . [and that he] prostituted their evaluation . . . [and] pissed the County's $5,000 down the sewer because they violated the law." (Def. St., Ex. 17 at 107). The hearing officer concurred with the Hospital's decision to "not to chance placing [Bodenstab's] co-workers in harms way by returning him to work and to discharge Bodenstab based on the recommendations in the report from the PRC." (Def. St., Ex. 18 at 4, 6). The hearing officer denied Bodenstab's appeal. (Def. St., Ex. 18 at 6).

## II. Standard of Review

When deciding a motion for summary judgment, a court must view the record and all inferences drawn from it in the light most favorable to the non-moving party. *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). A court, however, must draw these inferences from the specific facts in the record. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922-23 (7th Cir.1994). Conclusory allegations are insufficient to defeat a motion for summary judgment. *Keri*, 458 F.3d at 628. The rules governing summary judgment apply when the parties file cross-motions. *Cont'l Cas. Co. v. Northwestern Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir.2005). A court's role on summary judgment is not to determine the truth or test the credibility of the witnesses, but to determine whether there is a genuine issue of triable fact.

## III. ADA Claims

Although Bodenstab's Third Amended Complaint contains only one count pursuant to the ADA, the Complaint actually contains three distinct claims under the ADA. First, Bodenstab alleges that the Hospital failed to make a reasonable accommodation for a perceived disability. Second, Bodenstab alleges that the Hospital discriminated against him on the basis of a perceived disability. Finally,

7

Bodenstab alleges that the Hospital retaliated against him for protesting discriminatory conduct. The Court will examine each claim in turn.

A.  Failure to Accommodate

To succeed on his failure-to-accommodate claim under the ADA, Bodenstab must show (1) that he is a qualified individual with a disability; (2) the Hospital was aware of that disability; and (3) the Hospital failed to reasonably accommodate the disability. *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir.2005). In order to show that he was disabled, Bodenstab must show either (1) that he has a "physical or mental impairment that substantially limits [him in] one or more major life activities"; (2) that he "has a record of such an impairment"; or (3) that the employer "regarded [him] as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C). Further, the employment provisions of the ADA only protect qualified individuals with disabilities; those individuals who, with or without a reasonable accommodation, can perform the essential functions of their position. *See* 42 U.S.C. § 12111(8); *Miller v. Ill. Dep't of Corr.*, 107 F.3d 483, 485 (7th Cir.1997).

The Hospital argues both that Bodenstab is not disabled within the meaning of the ADA and that, even if he is, that he is not a qualified individual with a disability. Both arguments would also defeat his disparate treatment claim because demonstrating that Bodenstab is a qualified individual with a disability is also the first element of that claim. *See Cassimy v. Board of Educ. of Rockford Public Sch., Dist. No. 205*, 461 F.3d 932, 935-36 (7th Cir. 2006).

The Hospital argues that Bodenstab is not a qualified individual within the meaning of the ADA because he sabotaged the PRC's evaluation process. The undisputed facts demonstrate that an independent psychiatrist, performing an evaluation at the end of Bodenstab's treatment program, suspected Bodenstab of looking up answers to the Rorschach inkblot test on the internet to skew the

results of his test. Bodenstab himself testified that he "prostituted" the PRC's evaluation and "pissed away" the money the Hospital spent on the diagnosis by deliberately giving incorrect answers and by refusing to take his medication. Throughout the evaluative process, it is undisputed that Bodenstab remained belligerent and uncooperative. While these facts are undisputed, they are not material. That Bodenstab may have sabotaged efforts to diagnose him (and not, significantly, to treat him) does not speak to the issue of whether he can perform his job with a reasonable accommodation.

The Hospital cites several cases for the proposition that an Bodenstab's failure to cooperate with an evaluative process doom his ADA claims. None of the cases cited by the Hospital are convincing. In one, the plaintiff refused several reasonable accommodations and insisted that the defendant accommodate her in the way she desired. *Webster v. Methodist Occupational Health Centers, Inc.*, 141 F.3d 1236, 1238-39 (7th Cir. 1998). While *Webster* certainly stands for the proposition that a plaintiff may not request a specific accommodations, it does not stand for the proposition that an employee who does not cooperate in an evaluative process loses the right to a reasonable accommodation entirely. *Id.* In another case cited by the Hospital, an FMLA-claimant failed to appear at a medical examination requested by the Hospital pursuant to 29 U.S.C. § 2613(c). *Diaz v. Fort Wayne Foundry Inc.*, 131 F.3d 711, 713 (7th Cir. 1997). But the FMLA explicitly requires employees filing claims to substantiate their serious health condition and allows employers to get a second opinion prior to paying benefits, and accordingly places that decision in a much different context than a failure to accommodate claim. The Court holds that the Hospital is not entitled to summary judgment on Bodenstab's ADA claims merely because Bodenstab did not cooperate with an evaluative treatment program.

The Hospital next argues that Bodenstab is not a "qualified individual" because he posed a direct threat to the health or safety of other individuals in the work place. Based largely on the alleged threats

Bodenstab made, the Hospital argues that Bodenstab is not a qualified individual with a disability because he posed a direct threat to Hospital co-workers and patients. Under the ADA, it is a defense to a charge of discrimination if an employee poses a direct threat to the health or safety of himself or others. 42 U.S.C. § 12113(a), (b); *Borgialli v. Thunder Basin Coal Co.*, 235 F. 3d 1284, 1290-91 (7th Cir. 2000). When evaluating whether an employee poses a direct threat, courts are to make an individualized assessment of an individuals ability to safely perform the essential functions of the job. *See Borgialli*, 235 F.3d at 1291 (listing factors to consider).

The ADA does not require employers to take unnecessary risks when dealing with mentally or physically impaired employees. *See Emerson v. Northern States Power Co.*, 256 F.3d 506, 514-15 (7th Cir. 2001); *Borgialli*, 235 F.3d at 1294-95. In *Borgialli*, the court held that an employee who harbored a grudge against a supervisor and who threatened suicide and injury to others did pose a direct threat to others. *Borgialli*, 235 F.3d at 1294-95. In *Borgialli* two independent medical opinions supported the employer's conclusion that the plaintiff posed a direct threat to the safety of others, and the plaintiff had refused to assent to a third medical opinion. *Id.*

The facts are similar here. The Hospital points to the alleged threats regarding his coworkers that Bodenstab made, FBI and police investigations, the PRC discharge summary that suggests that Bodenstab's "vulnerability to be disruptive under certain highly charged political contexts could possibly lead to compromised patient care," and Kapoor's finding that Bodenstab "wouldn't be able to handle an emotionally-charged situation" at the Hospital. Although the record contains the opinion of a medical expert, one retained by Bodenstab, that Bodenstab posed a low degree of risk to his coworkers, this evidence was not available to the Hospital at the time it made its decision to terminate Bodenstab. (Oblosky Dep. at 78).

The Hospital knew only that it had an employee who had made a phone call that had prompted both FBI and police investigations and that an independent medical examination had determined that his potential to be disruptive could possibly compromise patient care. The PRC discharge report noted that Bodenstab became compromised by strong feelings and could not remain "clear minded" when issues related to the Hospital arose. The discharge report further noted that in these situations, "his thinking would become highly personalized, over-elaborative, and rigid," and that "his vulnerability to be disruptive under certain highly charged political contexts could possibly lead to compromised patient care." *See* Def. St., Ex. 19. While Bodenstab continues to insist that he never intended the comments he made to Wengeler to be construed as a threat and that the Hospital is mistaken in its belief, it is not the Court's role to reevaluate personnel decisions made by the Hospital to determine if the Court would have arrived at a different conclusion. The Hospital's decision that Bodenstab posed a direct threat is supported by FBI and police investigations and independent medical opinions.

But even if the Hospital could not demonstrate that Bodenstab posed a direct threat, it still could prevail on summary judgment because Bodenstab does not have an impairment that substantially limits him in one or more major life activities, and therefore is not disabled within the meaning of the ADA. *See Squibb v. Memorial Medical Ctr.*, 497 F.3d 775, 780-81 (7th Cir. 2007); *Rooney v. Koch Air, LLC*, 410 F.3d 376, 380-81 (7th Cir. 2005). The Hospital admits that Bodenstab had a mental impairment, but argues that it does not substantially limit a major life activity — such as working.

In support, the Hospital points to the PRC's discharge summary, which comments that Bodenstab is fit to practice medicine with skill and safety but that he is a bit unsteady when faced with issues associated with the Hospital. *See* Def. St., Ex. 19. In other words, the Hospital argues that Bodenstab is not disabled merely because his mental disability creates conflict with Hospital personnel and thus

substantially limits his ability to work at one particular hospital. *See Squibb*, 497 F.3d at 782; *Rooney*, 410 F.3d at 381; 29 C.F.R. § 1630.2(j)(3)(I) (inability to perform one particular job does not constitute a substantial limitation in the major life activity of working). The Seventh Circuit has held that personality conflicts — even when they produce anxiety or depression — are not disabling. *See Palmer v. Circuit Court of Cook County*, 117 F.3d 351, 352 (7th Cir. 1997). If Bodenstab's personality conflict triggers a serious mental illness that is itself disabling, then it might qualify as a disability. *Id.* Bodenstab's illness, however, interferes only with his ability to work at one particular Hospital, and not as an anesthesiologist generally, and thus, is not substantially limited with regard to the major life activity of working.

In response, Bodenstab suggests that the Hospital regarded him as being disabled. *See Squibb*, 497 F.3d at 786. In support, Bodenstab points to a January 17, 2003, letter sent to him by Langer, summarizing the charges Bodenstab would have to answer in his disciplinary hearing. Bodenstab highlights Langer's reference to the PRC's September 2002 conclusion that "the assessment team finds Dr. Bodenstab to be impaired at this time and therefore unable to practice medicine with skill and safety." *See* Def. Ex. 12. Langer, however, refers to the PRC's September conclusion not to assert the Hospital's belief that he was not capable of practicing medicine, but to explain the Hospital's decision to terminate his paid suspension at that time and allow Bodenstab to take leave to enter the PRC treatment program. Langer later references the PRC's discharge report, in which it recommended that Bodenstab not return to work in an emotionally or politically charged environment, such as the Hospital. The Court holds that the September 17 letter from Langer does not create a genuine issue of material fact as to whether the Hospital regarded Bodenstab as disabled.

Accordingly, the Court holds that Bodenstab did not have an impairment that substantially limited a major life activity, and therefore he is not disabled within the meaning of the ADA.

B.  Disparate Treatment

The ADA prohibits employers from discriminating against qualified individuals because of their disabilities. 28 U.S.C. § 12112(a). As noted earlier, the Court's ruling that Bodenstab is not disabled within the meaning of the ADA defeats his disparate treatment claim as well. Even if it did not, the Court would still grant summary judgment in favor of the Hospital.

As in other disparate treatment cases, a plaintiff pursuing an ADA disparate treatment claim may proceed under the direct method or the burden-shifting method articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*. *Timmons v. General Motors Corp.*, 469 F.3d 1122, 1126 (7th Cir. 2006). Under the direct method, a plaintiff can use either direct or circumstantial evidence that points to a discriminatory motive for the employer's actions. *Id.* Bodenstab appears to make an argument under the direct method but produces, at best, only a skeletal argument that a convincing mosaic of evidence supporting an inference of discrimination exists. In constructing this argument, Bodenstab cites no authority. Instead, he merely lists 16 separate pieces of evidence (most of which contain no reference to the record) without any sort of explanation.

For example, Bodenstab mentions Langer's 2003 suspension letter and Thomas's 2003 termination letter, both of which reference the findings of the PRC, but never explains how a fact-finder might construe either letter to be circumstantial evidence of the Hospital's discriminatory motive. In a similar vein, Bodenstab repeatedly refers to the Hospital's alleged failure to follow an internal policy or to confer with him about his call to Wengeler or the PRC reports without identifying why such facts point to a discriminatory motive. Other pieces of evidence merely reflect Bodenstab's opinion: his

claim, for instance, that Langer and Thomas exaggerated their perception of the threat posed by Bodenstab or his claim that Langer "feigned" an inability to remember certain conversations.

In the end, what is left are the pieces of an unsolved jig saw puzzle, unceremoniously dumped onto the Court's bench. Bodenstab makes no effort to demonstrate how the pieces fit together or how they resemble the pieces of other puzzles where a court found evidence to support an inference of discrimination. In the end, it is not the Court's job to put together the pieces of the puzzle — that is counsel's. *330 West Hubbard Restaurant Corp. v. United States*, 203 F.3d 990, 997 (7th Cir. 2000) ("in order to develop a legal argument effectively, the facts at issue must be bolstered by relevant legal authority; a perfunctory and undeveloped assertion is inadequate to raise a basis for appeal."); *Corley v. Rosewood Care Center, Inc. Of Peoria*, 388 F.3d 990, 1006-07 (7th Cir. 2004) (it is not the court's obligation to conduct legal research necessary to construct an argument from set of facts); *DePauw v. Ingersoll-Rand*, No 06 C 1161, 2007 WL2955576, at *8 (C.D. Ill. Oct. 10, 2007) (pointing to two individuals and expecting court to construct an argument that those two individuals are similarly situated is insufficient).

Under the indirect method, plaintiffs must first make a *prima facie* showing of discrimination, which requires a plaintiff to point to evidence demonstrating that he is disabled within the meaning of the ADA, that he was meeting his employers legitimate business expectations, that he suffered an adverse employment action, and that similarly situated employees were treated more favorably. *Kampmeir v. Emritus Corp.*, 472 F.3d 930, 937 (7th Cir. 2007); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). Sometimes a plaintiff cannot point to similarly situated employees, in which case a plaintiff can survive summary judgment by pointing to circumstances surrounding the adverse

employment action that show it is more likely than not that the disability was the reason for the employer's action. *Timmons*, 469 F.3d at 1126. Once a plaintiff has made a *prima facie* showing, the employer must point to a non-discriminatory reason for its action, which the plaintiff must demonstrate to be pretextual in order to survive summary judgment. *Id.* In order to demonstrate that a reason is pretextual, Bodenstab must show either that the Hospital's reason had no basis in fact, it did not actually motivate the Hospital's decision, or that it was insufficient to motivate that decision. *Forrester v. Rauland-Borg. Corp.*, 453 F.3d 416, 418 (7th Cir. 2006).

In this case, the Hospital again points to Bodenstab's call to Wengeler, which triggered a Chicago Police and FBI investigation into Bodenstab's alleged threats, and the PRC discharge summary. Bodenstab argues that the Hospital could not possibly have believed that he posed a threat based on the "testimony of all witnesses," without further elaboration. Bodenstab also points out that the staff at PRC concluded that his threats were merely "angry fantasies." But Bodenstab does not accurately characterize the findings of the PRC. The Diagnostic Assessment never concluded that the threats Bodenstab made to Wengeler were merely angry fantasies. Instead, it merely reported that Bodenstab himself described them that way. (See Def. St., Ex. 8 at 3). In any event, Bodenstab also mischaracterizes both the law and the Hospital's argument. It does not matter that the threats he made to Wengeler might have been misinterpreted or that the Hospital was wrong to believe that he made them. *Merillat v. Metal Spinners Inc.*, 470 F.3d 685, 693 (7th Cir. 2006); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). Instead, the sole question for the Court is whether the Hospital honestly believed that Bodenstab had threatened his employees or whether the Hospital honestly believed the recommendations in the PRC discharge summary necessitated his termination.

In this case, the police and the FBI investigated the threats and conferred with Hospital personnel. A diagnostic assessment made by independent psychiatrists stated that Bodenstab admitted to having made the threats. Finally, the PRC's discharge summary (which the Hospital's psychiatrist, Kapoor, concurred with) noted that Bodenstab had a tendency to be "disruptive under certain highly charged political contexts [which] could possibly lead to compromised patient care."

Bodenstab cannot show that these reasons had no basis in fact. Further, Bodenstab has pointed to no evidence to suggest that the Hospital did not honestly believe that the Police and FBI were investigating a credible threat or that the assessment of the PRC that his tendency to be disruptive could lead to compromised patient care. *See Crim v. Board of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 541-42 (7th Cir. 1998) (plaintiff must demonstrate that all of the employer's reasons are pretextual). Thus, he cannot demonstrate that these reasons did not actually motivate his discharge. Finally, he does not suggest (nor could he reasonably do so) that alleged death threats to employees or potentially compromised patient care are insufficient reasons to discharge him. *See, e.g., Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130 (7th Cir. 1994) (alleged death threat to co-worker sufficient to warrant discharge); *Palmer*, 117 F.3d at 352; *Smith v. Leggett Wire Co.*, 220 F.3d 752 (6th Cir. 2000).

C. Retaliation

In his Complaint, Bodenstab alleges that the Hospital retaliated against him for requesting an accommodation pursuant to the ADA and for his opposition to perceived discrimination that violated the ADA. (Def. St., Ex. 1 at 6). Bodenstab does little to elaborate on these allegations in either of his briefs, claiming only that he engaged in protected expression when he wrote to Thomas requesting that Thomas return him to work. (Pl. St., Ex. 57). Bodenstab's letter, however, does not request an accommodation or protest the Hospital's discriminatory practices. Instead, it rambles through six pages

16

of reasons why he believes he should return to work. Almost in its entirety, the letter constitutes a discussion of his conversation with Wengeler, an explanation of Bodenstab's personal belief that his "conditional syllogism" did not constitute a threat, and a defense of his position that he does not pose a threat to himself or others. The letter does not refer to a practice made unlawful by the ADA. Instead, Bodenstab argues that he operated at all times with a clear an rational mind, devoid of any limitation that would impact his ability to perform his job. Nor does he ever request an accommodation, and instead urges the Hospital to return him to work without limitation, directly disavowing any notion that he might have been disabled. Moreover, even if the Court were to construe Bodenstab's letter as "protected activity," he sent the letter *after* the Hospital had already initiated disciplinary proceedings against him.

Bodenstab did not engage in protected activity, and therefore his retaliation claim fails.

## IV. Section 1983 Claim

Bodenstab includes a variety of claims under 42 U.S.C. § 1983, none of which have merit. These claims require little discussion.

For instance, Bodenstab claims that the Hospital and individual Defendants treated him differently than other similarly situated employees, thereby creating a "class of one." The Seventh Circuit has rejected similar claims, holding that to bring a "class of one" claim a plaintiff must demonstrate that there is no reasonably conceivable state of facts that could provide a rational basis for the classification. *Lauth v. McCollum*, 424 F. 3d 631 (7th Cir. 2005). That is not the case here, as the police and FBI investigations into Bodenstab's conversation with Wengeler and the subsequent discharge report from the PRC more provide such a rational basis.

Bodenstab also claims that the Hospital violated his Fourth and Fourteenth Amendment rights when it required him to sign an authorization for a psychiatric evaluation. This argument is frivolous.

17

At the time the Hospital required the evaluations, both the Chicago Police and the FBI had contacted it regarding alleged death threats made by Bodenstab against members of the staff. The Hospital would have been grossly negligent to ignore such threats. The ADA allows employers to inquire into an employee's medical condition when such inquiry is job-related or a business necessity. *See* 42 U.S.C. § 12112(d)(4); *Krocha v. City of Chicago*, 203 F. 3d 507, 515 (7th Cir. 2000).

Bodenstab next claims that the Hospital deprived him of both substantive and procedural due process rights by terminating his employment.[3] Under *Cleveland Board of Education v. Loudermill*, an employee with a property interest in his job who also has an adequate post-deprivation remedy must only be given a pre-suspension hearing that includes notice of the charges, an explanation of the employer's evidence, and the opportunity for the employee to present his own evidence. 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed. 494 (1985); *see also Salas v. Wisc. Dep't of Corrections*, 493 F.3d 913, 927 (7th Cir. 2007).

The Hospital afforded Bodenstab these pre-deprivation procedural rights: informing him by letter of the nature of the charges against him and nature of the Hospital's evidence and providing him with a pre-suspension hearing at which Bodenstab's counsel presented his side of the story. The Hospital also provided Bodenstab with a post-suspension hearing before an independent hearing officer at which he was represented by counsel, presented witnesses, was permitted to testify, was permitted to cross-examine the Hospital's witnesses, and introduced exhibits. Nothing more is required. *See Salas*, 493 F.3d at 927; *see also Belcher v. Norton*, 497 F.3d 742, 751-52 (7th Cir. 2007).[4]

---

[3] Bodenstab's substantive due process claim is cursory and undeveloped. He merely alleges that the Hospital deprived him of "both a property interest and liberty interest," without further elaboration. The Court will not address this claim.

[4] Bodenstab makes various arguments about the time-line regarding the administrative hearings, but any delays were caused by Bodenstab himself, who changed his mind about the type

Lastly, Bodenstab claims the Hospital violated his right to free speech by terminating him for calling attention to "ghost surgeries" and other purportedly illegal activities at the Hospital. Bodenstab's speech in this regard is not protected at all. Bodenstab made several internal complaints, mostly regarding Winnie (the doctor Wengeler believed Bodenstab intended to kill), and as such are not public speech at all. Further, even if Bodenstab's speech were protected, his complaints occurred either four or more years prior to the disciplinary proceedings that led to his termination or after the proceedings were initiated.[5]

Accordingly, the Court GRANTS the Hospital's motion for summary judgment on Bodenstab's § 1983 claims.

## V. Declaratory Judgment[6]

Bodenstab asks the Court to declare that the Hospital should not have disciplined him under the Cook County Hospital Policy Manual Governing Employee Conduct, but under the Hospital Medical Staff Bylaws. The former governs the conduct of Hospital employees, while the latter governs a

---

of hearing he desired, who changed law firms several times during the process, who delayed the psychiatric evaluation by refusing to see the Hospital's psychiatrist and then by negotiating through his attorneys the terms of the evaluation, whose attorneys requested delays because they could not contact Bodenstab, and whose attorneys participated in settlement discussions.

[5] For example, in 1998 Bodenstab wrote to the peer review committee regarding allegations that Winnie performed ghost surgeries. (Bodenstab Dep. at 93-95). In 1993, Bodenstab complained, internally, that another doctor had abandoned a patient in the operating room. (Bodenstab Dep. at 148-149). Bodenstab again complained to the peer review committee about Winnie in 2003. (Bodenstab Dep. at 156-57).

[6] Although 28 U.S.C. § 2201 *et seq* does not serve as an independent basis for jurisdiction, under 28 U.S.C. § 1367(c) does not require the Court to dismiss pendant state claims when the Court has dismissed all claims over which it had original jurisdiction. *See Williams Elec. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir.2007). It is obvious how these claims should be decided, and the Court will address them briefly.

practitioner's (who may or may not be employed by the Hospital) privilege to practice at the Hospital. *See generally, Applebaum v. Garibaldi*, 194 Ill.2d 438, 742 N.E2d 279 (Ill. 2000).

Bodenstab also asks the Court to declare that the PRC's records was procured contrary to law. This claim, however, is frivolous. As noted earlier, the Hospital had every right to require Bodenstab to undergo a psychiatric evaluation.

## VI. Common Law Certiorari

In his final claim, Bodenstab asks the Court to review the administrative agency's determination and reverse its findings. The standard of review of agency's decision to discharge public employee is whether its findings of fact are contrary to manifest weight of evidence and whether they provide sufficient basis for the decision that cause for discharge does or does not exist. *See, e.g., Starkey v. Civil Serv. Comm'n*, 97 Ill. 2d 91, 454 N.E.2d 265 (1983); *Finnerty v. Personnel Board of the City of Chicago*, 303 Ill. App. 3d 1, 707 N.E.2d 600 (1999).

There is more than ample evidence in the record, as recounted above, to support the administrative agency's findings of fact and its conclusion that those facts provide a sufficient basis for the Hospital's decision to discharge Bodenstab.

For the foregoing reasons, the Court GRANTS the Hospital's motion for summary judgment and DENIES Bodenstab's motion for summary judgment.

IT IS SO ORDERED.

1/28/08
Dated

Hon. William J. Hibbler
United States District Court